UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMELIA EUCEDA, as an individual and as successor in interest to JESUS NOE MALDONADO, decedent,

        Plaintiff,

  v.

PELICAN BAY STATE PRISON, et al.,

        Defendants.
_____/

No. C 06-1411 PJH

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Now before the court is defendants' motion for summary judgment. Having carefully reviewed the parties' papers and considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the motion for the following reasons.

**BACKGROUND**

On February 24, 2006, Amelia Euceda ("plaintiff") filed a complaint on behalf of her deceased son, Jesus Noe Maldonado ("decedent" or "Mr. Maldonado"), alleging that defendants violated her son's Eighth Amendment rights by showing deliberate indifference to his medical needs while he was incarcerated at Pelican Bay State Prison ("PBSP"). Defendants are Richard Kirkland, the warden of PBSP, alleged to have failed to adequately supervise and train staff and put in place procedures so that decedent was able to receive medically appropriate care; Maureen McLean[1], a nurse at PBSP; and Does 1-25, alleged to be directors, managers, or supervisors of medical and health care delivery at PBSP. See

---

[1] While plaintiff names Maureen "McClean" as a defendant in her complaint, her name is spelled "McLean".

1

Complaint ¶¶5-7.  Plaintiff never amended her complaint to name said Does, and the discovery deadline passed in April 2007.

Plaintiff alleged that on or about 1:00 p.m. on April 1, 2004, decedent was taken to the PBSP infirmary, placed in a prone position and five point restraints by correctional offers and/or medical staff, and injected with drugs, including but not limited to anti-anxiety and anti-psychotic medications.  He was then left unattended for between forty minutes to one hour, during which time he experienced respiratory distress and/or cardiac arrest.  Id. ¶¶ 9-10.  When medical staff discovered his condition at around 4:10 p.m., they waited 35 minutes before calling 911.  Maureen McLean was one of the staff responsible for decedent's care on that date.  Decedent was in cardiac arrest when paramedics arrived at the prison, and he was pronounced dead that evening.  Id. ¶¶ 11-12.  Plaintiff alleged one cause of action under 42 U.S.C. § 1983 on the basis that defendants were deliberately indifferent to decedent's medical needs and violated decedent's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

Defendants now move for summary judgment.

**FACTS**

As a preliminary matter, plaintiff has not authenticated her exhibits.  In some cases, it is difficult to tell exactly what each exhibit is.  However, these exhibits seem like they are potentially admissible, as they appear to be either hospital or prison records and reports.  The court has therefore considered these facts, in spite of plaintiff's failure to submit any properly authenticated evidence.

The facts are as follows.  Mr. Maldonado was transferred to PBSP in November 1999.  During the early months of his stay, he was diagnosed with schizoaffective disorder, bipolar type with psychotic features.  While at PBSP, he was seen weekly by his primary clinician, and monthly by his psychiatrist for medication management, and was assigned to weekly group therapy.  See Ex. 4.

Commencing on March 31, 2004, Mr. Maldonado spent 22 hours and 35 minutes in an isolated "quiet cell" in PBSP, which is equipped with a sink, toilet, and running water.  Quiet cells are used to house inmates who exhibit disruptive behavior but do not require

2

1  placement in a mental health crisis bed or correctional treatment center.  See Ex. 1.
2  Correctional officers were responsible for making this transfer, after they reported that
3  decedent's continuous yelling was causing other inmates to become disruptive.  Id.

4  Unit psychiatrist Dr. John Douglas saw Mr. Maldonado at 1230 hours on April 1,
5  2004, and the doctor recommended removing him from the quiet cell and possibly putting
6  him into five point restraints, after Mr. Maldonado flooded his cell, began drinking from the
7  toilet, and tried to pour water into his nose.  It was also reported that Mr. Maldonado was
8  defecating in the water and shouting.  Dr. Douglas then authorized his removal from the
9  cell.  An extraction team was used to remove decedent from his cell and take him to the
10  infirmary.  See Exs. 1, 6.

11  After Mr. Maldonado was taken to the infirmary, Dr. Heino Lange evaluated him and
12  ordered that he be placed in restraints.  Ex. 4.  He was checked at 1530 hours and was fine
13  per staff, but was in respiratory distress at 1610 hours.  The ambulance was called at 1643
14  hours, and when the ambulance arrived, the paramedics determined that Mr. Maldonado
15  was in cardiac arrest.[2]  His airway had been blocked with copious amounts of vomit (which
16  appeared to contain blood and smelled like feces), and there seems to be a dispute as to
17  whether he was ventilated prior to ambulance arrival.  See Exs. 2, 6 & Ex. C.  The nurses,
18  however, began compressions, rescue breathing, suctioning, and started an IV drip prior to
19  ambulance arrival.  See Ex. 7.  RN Scott then asked on-call nurse practitioner Maureen
20  McLean to return to the infirmary immediately, notifying her that the ambulance had already
21  been called.  Nurse McLean arrived at the scene a couple of minutes" after the paramedics
22  arrived and "took over the leadership of the code."  See id.  She then reported details of

---

[2] There are some discrepancies in the record regarding this timeline.  What appears to be the emergency room record shows a slightly different timeline.  According to that record, the nurse observed gurgling in the decedent's breathing at 1530 hours, the paramedics were called at 1545 hours, and the paramedics arrived at the prison at approximately 1605 hours. See Ex. 6.  In addition, the death report shows that the patient was not observed to be in distress until 1640 hours, minutes before the ambulance was called.  See Ex. C.  According to the prison, he was seen by the registered nurse ("RN") every 15 minutes from 1330 hours until 1640 hours, but this fact is disputed.  See Exs. 4, 6 & Ex. C; but see Ex. 2.  Construing facts in a light most favorable to plaintiff, however, the facts are that: (1)  there was a 33 minute gap from when Mr. Maldonado went into respiratory distress and an ambulance was called; and (2) prison staff left him unattended for 40 minutes before he went into respiratory distress.

1 the prison's care and Mr. Maldonado's condition to the hospital emergency room.  <u>See</u> Ex.
2 6.
3   The ambulance transported Mr. Maldonado to the Sutter Coast hospital.  He was
4 pronounced dead at the hospital at 1758 hours on April 1, 2004.  He was 29 years old. The
5 coroner found that the cause of death was "excited delirium" or "neuroleptic malignant
6 syndrome", which usually occurs when drugs, agitation, restraint are involved and the
7 victim perceives a threat to his life which can cause cardiac arrest.  <u>See</u> Ex. 3.
8   As for the specific defendants, Warden Kirkland was made acting warden at PBSP
9 on February 3, 2004.  He was familiar with the day-to-day operations at PBSP and the
10 relevant policies and procedures.  He has since retired from that position.  He did not know
11 inmate Maldonado and does not recall having any personal contact with him during his
12 incarceration.  Kirkland Decl. ¶ 4.  He has never ordered any inmate to be placed in clinical
13 restraints.  Id. ¶ 7.  The health care manager, not the warden, is responsible for training
14 and supervising prison medical staff.  Id. ¶ 6.
15   As for defendant McLean, she is a nurse practitioner, and was on-call from 4:00 p.m.
16 on April 1, 2004 through 8:00 a.m. the following day at the PBSP medical facility.  As such,
17 it was her responsibility to advise registered nurses over the phone or to return to the
18 prison personally to evaluate a patient's medical needs.  McLean Decl. ¶ 2.  While she
19 provides a higher level of care than an RN, it was not her job to supervise the RNs – rather,
20 there was a supervising RN responsible for overseeing RNs on duty.  <u>Id</u>.  Before leaving for
21 home on April 1, 2004, she notified the staff that she was on call and made sure they had
22 her number.  This took place between 4:00 and 4:30 p.m.   When she arrived at home, her
23 husband immediately notified her that she had received a call from the prison and needed
24 to return.  She called the prison, spoke to a nurse there, and was informed that the
25 ambulance was on the premises.  Nurse McLean returned to the prison, and when she
26 arrived, Mr. Maldonado was already in the custody of the ambulance team.  She spent
27 approximately five minutes assisting with ventilation and cardiac compressions.  The
28 ambulance then headed for Sutter Coast Hospital.  McLean went back to the prison
medical facility, reviewed Mr. Maldonado's medical chart, spoke to on-duty staff, and called

4

1 Sutter Coast Hospital to give them his medical history and describe the medial events of
2 the day. Id. ¶¶ 3-8. Before April 1, 2004, she had never met or interacted with inmate
3 Maldonado. Id. ¶ 11.

4 **DISCUSSION**

5 A.   Legal Standards

6     1.   Summary Judgment

7 Summary judgment shall be granted if "the pleadings, depositions, answers to
8 interrogatories, and admissions on file, together with the affidavits, if any, show that there is
9 no genuine issue as to any material fact and that the moving party is entitled to judgment
10 as a matter of law." FRCP 56(c). Material facts are those which may affect the outcome of
11 the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to
12 a material fact is genuine if there is sufficient evidence for a reasonable jury to return a
13 verdict for the nonmoving party. Id. The court must view the facts in the light most
14 favorable to the non-moving party and give it the benefit of all reasonable inferences to be
15 drawn from those facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
16 587 (1986).

17 A party seeking summary judgment bears the initial burden of informing the court of
18 the basis for its motion, and of identifying those portions of the pleadings and discovery
19 responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp.
20 v. Catrett, 477 U.S. 317, 323 (1986). If the nonmoving party fails to show that there is a
21 genuine issue for trial, "the moving party is entitled to judgment as a matter of law." Id.

22     2.   Section 1983

23 Section 1983 "provides a cause of action for the 'deprivation of any rights, privileges,
24 or immunities secured by the Constitution and laws' of the United States." Wilder v.
25 Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990). Section 1983 is not itself a source of
26 substantive rights, but merely provides a method for vindicating federal rights elsewhere
27 conferred. See Graham v. Connor, 490 U.S. 386, 393-94 (1989). To state a claim under §
28 1983, a plaintiff must allege two essential elements: (1) that a right secured by the
Constitution or laws of the United States was violated; and (2) that the alleged violation was

5

committed by a person acting under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988); Ketchum v. Alameda County, 811 F.2d 1243, 1245 (9th Cir. 1987).

Liability under § 1983 arises only upon a showing of personal participation by the defendant. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979). A supervisor is only liable for constitutional violations of his or her "subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them," as there is no respondeat superior liability. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

3.   Eighth Amendment

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. See Helling v. McKinney, 509 U.S. 25, 31 (1993). In its prohibition of "cruel and unusual punishment," the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive force against prisoners. See Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). The Amendment also imposes duties on these officials, who must provide all prisoners with the basic necessities of life such as food, clothing, shelter, sanitation, medical care and personal safety. See Farmer, 511 U.S. at 832; Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982).

A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, see Farmer, 511 U.S. at 834 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, see id. (citation omitted). In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation. The more basic the need, the shorter the time it can be withheld. See Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000).

In prison-conditions cases, the necessary state of mind is one of "deliberate indifference." Wilson, 501 U.S. at 302-03 (general conditions of confinement); Helling, 113 S. Ct. at 2480 (inmate health); Estelle v. Gamble, 429 U.S. 97, 104 (1976) (inmate health).

1  Neither negligence nor gross negligence will constitute deliberate indifference.  See
2  Farmer, 114 S. Ct. at 1978 & n.4; see also Estelle, 429 U.S. at 106 (establishing that
3  deliberate indifference requires more than negligence).  A prison official cannot be held
4  liable under the Eighth Amendment for denying an inmate humane conditions of
5  confinement unless the standard for criminal recklessness is met, i.e. the official knows of
6  and disregards an excessive risk to inmate health or safety.  Farmer, 114 S. Ct. at 1979.
7  The official must both be aware of facts from which the inference could be drawn that a
8  substantial risk of serious harm exists, and he must also draw the inference.  Id.  An Eighth
9  Amendment claimant need not show, however, that a prison official acted or failed to act
10 believing that harm actually would befall an inmate; it is enough that the official acted or
11 failed to act despite his knowledge of a substantial risk of serious harm.  Id. at 1981; see
12 also Robins v. Meecham, 60 F.3d 1436, 1439-40 (9th Cir. 1995) (bystander-inmate injured
13 when guards allegedly used excessive force on another inmate need not show that guards
14 intended to harm bystander-inmate).  This is a question of fact.  Farmer, 114 S. Ct. at 1981.
15
16 B.     Defendants' Motion
17         Defendants argue that there is no evidence showing that the two defendants sued
18 here violated Maldonado's Eighth Amendment rights.
19         1.     Defendant Kirkland
20         As to defendant Kirkland, the warden of the prison, there is absolutely no evidence
21 in the record that he had any involvement with Mr. Maldonado's death.  Plaintiff maintains
22 that two incidents show deliberate indifference to the decedent's medical needs.  The first
23 is placing decedent in isolation for over 22 hours the day before he died.  The second is
24 placing Mr. Maldonado in five point restraints and denying him appropriate medical care.
25 //
26 //
27 //
28

The problem is that plaintiff only sued the warden and one nurse.[3]  As for the warden, Mr. Kirkland did not know of Mr. Maldonado before his death and did not order him to be placed in clinical restraints.  That decision was made by prison doctors.  Nor is there any evidence that he had anything to do with placing Mr. Maldonado in isolation.  Rather, the evidence shows that correctional officers made this decision.  Nor is there evidence that the warden was advised of Mr. Maldonado's serious medical needs or that he had any role in providing medical care to inmates.  Under prison policies, pacing an inmate in clinical restraints can only be ordered by a psychiatrist or psychologist to prevent injury to the inmate patient or others, and it is the responsibility of health care staff, not the warden, to observe inmate patients.  Given these facts, even though Mr. Maldonado certainly had very serious medical needs on April 1, 2004, defendant Kirkland was not deliberately indifferent to those needs, because there is no evidence that Kirkland knew of and disregarded any excessive risks to Mr. Maldonado's health or safety.  See Farmer, 114 S. Ct. at 1979.

Nor is defendant Kirkland is liable as a supervisor.  There is no respondeat superior liability here in the absence of any evidence that Kirkland "participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor, 880 F.2d at 1045.

2.   Defendant McLean

As for nurse practitioner McLean, while she provided medical care to Mr. Maldonado on the day that he died, there is no evidence that she was involved in the decisions to place Mr. Maldonado in isolation or in five point restraints.  As discussed above, these decisions were made by correctional officers and prison doctors, respectively.  Nurse McLean was not even at the prison when the decedent went into cardiac arrest.  She was on-call at the

---

[3] The parties list PBSP itself as a defendant in the case caption, even though it is not described as a party in the complaint.  Even assuming that PBSP was properly named as a defendant in the complaint, which it was not, as a state agency, it would be entitled to Eleventh Amendment immunity and cannot be held liable.  See Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985) (Eleventh Amendment protects states and their entities against suits brought by citizens in federal court); Montana v. Goldin, 394 F.3d 1189, 1195 (9th Cir.2005) (state agencies are protected by Eleventh Amendment immunity).

time, and returned to the prison after receiving a phone call about the decedent's condition. The nurse on duty informed her that the ambulance was at the prison, and when she returned to the facility, the paramedics were already ventilating Maldonado. She assisted in resuscitation efforts for five minutes, but this was her only brief involvement in the events of that day.

Nor is nurse McLean liable as a supervisor. There is no evidence that she participated in, directed, or knew of any excessive risks to Mr. Maldonado's safety. As for the other RNs who provided him with care that day, defendant McLean had no supervisory role over any of the RNs on duty.

3.  Qualified Immunity

Even assuming there was a factual issue as to whether defendants' conduct violated decedent's Eight Amendment rights, defendants would be entitled to qualified immunity. If such a violation could be made out, defendants would be entitled to such immunity if it would not have been clear to a reasonable official in their position that the conduct at issue was unlawful in the situation he or she confronted. Saucier v. Katz, 533 U.S. 194, 202 (2001). If an official makes a mistake as to what the law requires, but that mistake is reasonable, the official is entitled to the immunity defense. Id. at 205. As stated above, neither defendant was responsible for putting decedent in isolation or in five point restraints. Because Kirkland had no involvement in Maldonado's treatment or care, it would not have been clear to any reasonable official in his position that his conduct was unlawful. McLean's brief resuscitation efforts after the decedent had already gone into cardiac distress were similarly reasonable.

**CONCLUSION**

While it is possible that various doctors and officers involved in ordering Maldonado into five point restraints and into isolation may have violated his Eighth Amendment rights, only McLean and Kirkland are named defendants in this case. Certainly Mr. Maldonado's death was very tragic. But plaintiff sued the wrong people and did not amend her complaint or seek leave to amend her complaint in order to substitute additional defendants for the

Doe defendants or to replace the improperly named defendants with those who were actually responsible for the decisions regarding Mr. Maldonado's care.  In accordance with the foregoing, defendants' motion is GRANTED.  This order terminates the case and any pending motions.  The clerk shall close the file.

**SO ORDERED**.

Dated:  July 12, 2007

_____
PHYLLIS J. HAMILTON
United States District Judge